*In re* E.S., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. E.S., Respondent-Appellant).

Fifth District   No. 5—85—0500

Opinion filed July 21, 1986.

HARRISON, J., dissenting.

Randy E. Blue and Rita K. Peterson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Randall J. Rodewold, State's Attorney, of Chester (Kenneth R. Boyle, Stephen E. Norris, and Neil F. Flynn, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

On April 19, 1985, the office of the State's Attorney of Randolph County filed a petition for adjudication of wardship concerning E.S., a minor, alleging that one day previously the minor (then 15) committed the offense of aggravated criminal sexual abuse in that he committed a sexual act with his five-year-old cousin. After an adjudicatory hearing, the circuit court found the minor delinquent and adjudged him a

ward of the court. After preparation of a dispositional report and a dispositional hearing, the minor was placed on probation until his 18th birthday. The minor appeals.

■■■ The minor first contends the court erred in finding the five-year-old girl competent to testify. Witnesses age 14 and over are presumed competent to testify. If testimony is to be permitted by a child less than 14 years of age, the judge must inquire whether the witness is sufficiently mature to receive correct impressions by his senses, to recollect these impressions, to understand questions and narrate answers intelligently, and to appreciate the moral duty to tell the truth. The decision of the trial judge in this matter will not be reversed absent abuse of discretion or misapprehension of the law. (*People v. Sims* (1969), 113 Ill. App. 2d 58, 61, 251 N.E.2d 795, 796-97.) In reviewing competency determinations, reviewing courts consider the length and depth of the preliminary examination and scrutinize the testimony of the witness at trial (*People v. Seel* (1979) 68 Ill. App. 3d 996, 1004, 386 N.E.2d 370, 377), but must recall that the points to be covered in a competency inquiry are rarely discernible from trial testimony (*People v. Sims* (1969), 113 Ill. App. 2d 58, 251 N.E.2d 795).

In the instant competency examination, most of the questions asked by the trial court were leading, and some of the five-year-old's answers were inappropriate. For example, when asked whether she understood when she was telling truth and when she was not telling the truth, she replied: "He did get up and beat me." She gave no response when asked: "Do you understand that when somebody is telling a lie and when somebody is telling the truth? Do you know what it means?" The court asked her: "Do you ever tell stories to your mommy that are not true?" She replied: "Well, get up and beat me." The court's attempt to get her to provide an example of a "fib" was unsuccessful. She gave appropriate answers when asked in leading fashion whether the judge had stated her name correctly, whether she knew right from wrong, whether she ever told her mother a fib, whether she had ever been spanked for fibbing, whether she knew what it meant if she told her mother a fib, whether she knew what it means if she told her mothing something untrue, whether she knew what it meant to tell the truth and not tell the truth, and whether she ever failed to put away her toys when told to do so.

■■ The minor argues that during the competency inquiry the court "did not inquire of the witness her age, where she lived, whether she went to school, or even what day it was which would indicate an ability to understand questions and to express answers." This is true. However, during her subsequent testimony at the adjudi-

catory hearing, she stated (without leading) her age and birthday, and when the assistant State's Attorney asked her if she talked to a policeman, she asked him if he meant the white one. She stated, again without leading, that at the time in question "[m]y mama was gone to see his grandma—," and that no one else was home "but Patricia and the little baby." Asked whether she went to school, she replied: "No, me and April don't." More examples of her perception, memory and ability to answer questions appear below, but the above examples sufficiently demonstrate those points. We cannot conclude the judge's decision as to competency was error.

■■ ■ The minor also argues that the allegations of the petition for wardship were not proved beyond a reasonable doubt and that the five-year-old's testimony was neither clear and convincing nor substantially corroborated. Under the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 701—1 *et seq.*), the State must prove the minor is delinquent beyond a reasonable doubt when the adjudicatory hearing is in the nature of a criminal proceeding. In a case involving a sex offense, the complainant's testimony must be substantially corroborated or clear and convincing. (*In Interest of Cruz* (1979), 76 Ill. App. 3d 565, 568, 395 N.E.2d 388, 391.) The witnesses at the adjudicatory hearing were the five-year-old, her mother, the minor, a Department of Children and Family Services investigator, a police officer, and a doctor who examined the five-year-old almost immediately after the alleged event.

The mother testified: When she got home her daughter was seated on the bed, buckling her shoe; the mother asked her what happened; the child said "nothing"; the mother asked again and threatened to "whoop" the child, who then said the minor had been "hunching" her and "messing" with her. The child was fully clothed, and while the mother referred to a "stain," she did not state its nature or location. The mother took her child to a hospital.

At the hospital, the doctor found no evidence of sexual conduct or other injuries. He ruled out penis-vagina penetration.

The DCFS investigator testified she went with the officer to the five-year-old's home after the child returned from the hospital. According to the witness, the child told her the minor touched her genital area with his "peeweiner."

The officer testified: The child told him the minor put his "peeweiner" in her vagina and made her wet. She indicated, rubbing both sides of her thighs. "I asked her where he put his penis," he testified, "and she patted the front of her vagina and said there. I said what did he do and she said he was messing with me."

The 15-year-old minor, testifying in his own behalf, answered all questions asked of him regarding the date in question and denied all physical contact with the child that day other than once when "I pushed her to the side so I wouldn't trip on her." According to the minor, he dozed off in front of the television and woke up when the mother (his aunt) got home; she asked the child if he had been "messing" with her, and threatened to whip the child, who then said yes.

The five-year-old testified as follows: Asked whether the minor did anything with her pants, she said he "[p]ut them down here," indicating. She nodded when asked if he touched her and indicated between her legs. Asked what he touched her with, she said "Peeweiner." She also said he "[l]aid me down" on "[t]he bathroom floor," and "[t]hat stuff came out." Asked what color "that stuff" was, she said: "It was black." She volunteered: "He got some toilet tissue and he got it off and flushed it." Afterwards: "I was buckling my shoes and my mama say what did I do and I was on the front of the bed." On cross-examination, the child testified this all happened "[l]ast night," and she admitted telling the officer that the minor put his "peeweiner" inside of her.

■ We believe the child's testimony was sufficiently clear and convincing. A prior inconsistent statement was proved through the officer, and her reference to the event as occurring the previous night is unexplained. However, some confusion in a five-year-old's testimony was inevitable. It is difficult to believe a child of that age would fabricate such a story or the details she supplied.

■ While we find the child's testimony sufficient to support the finding of delinquency, we also find her testimony corroborated by her mother's the investigator's and the officer's testimony that she did indeed complain. (See Ill. Rev. Stat. 1985, ch. 38, par. 115—10(2); *People v. Leamons* (1984), 127 Ill. App. 3d 1056, 1068, 469 N.E.2d 1137, 1146.) Defendant notes the rule of long standing that a corroborative complaint must be spontaneous, not the result of a series of questions to which answers were given. (*People v. Damen* (1963), 28 Ill. 2d 464, 471, 193 N.E.2d 25, 30.) In the case at bar, the child accused the minor only after twice being asked what happened, and the second question contained a threat. However, in light of all of the instant circumstances, including the child's age, we think the child's complaint had some corroborative value. The weight to be accorded that testimony in light of the questions put by the mother was for the trier of fact to decide. The trial court as trier of fact is to determine the credibility of all the witnesses and the weight to be given their testimony and its finding of guilt will be disturbed only where there appears a reason-

able doubt as to guilt. *People v. Catlett* (1971), 48 Ill. 2d 56, 64, 268 N.E.2d 378, 382.

■■■ The minor argues that the trial court erred in admitting the testimony of the mother and the investigator because the evidence was not admissible under the prompt-complaint exception to the hearsay rule. We think the testimony was in part properly allowed as "testimony by the person to whom the child complained that such complaint was made." (Ill. Rev. Stat. 1985, ch. 38, par. 115—10(2); see *People v. Powell* (1985), 138 Ill. App. 3d 150, 158, 485 N.E.2d 560, 565.) We agree with the minor's further contention that section 115—10 does not permit persons to whom a child victimized in a sexual act complained to recite all of the details of the child's complaint. (*People v. Powell* (1985), 138 Ill. App. 3d 150, 158, 485 N.E.2d 560, 565; *People v. Leamons* (1984), 127 Ill. App. 3d 1056, 469 N.E.2d 1137.) *In re C.K.M.* (1985), 135 Ill. App. 3d 145, 481 N.E.2d 883, cited by the State, does not expressly hold to the contrary, and we doubt whether the court in *C.K.M.* intended to so imply.

However, we think recitation of the details of the child's complaint was a technical error only and harmless. The child testified and was subject to cross-examination, thus obviating the primary objectionable feature of hearsay evidence. (See *People v. Leamons* (1984), 127 Ill. App. 3d 1056, 1069, 469 N.E.2d 1137, 1146.) In fact the officer's recitation was of benefit to the minor's position as it tended to show the prior inconsistent statement by the five-year-old regarding penetration. Further, the court indicated at the close of the adjudicatory hearing that what he was convinced by was the minor's "rather convincing story" and the fact of prompt complaint. Since the evidence is sufficient to support the finding of delinquency and there is no affirmative showing that the judge relied on incompetent evidence, we find no cause for reversal here.

■■■ The minor's ultimate contention is that the trial court erred in decreeing him a ward of the court prior to the dispositional hearing. Section 4—8(2) of the Juvenile Court Act presently requires that the court wait until the dispositional hearing to address the issue of wardship. (Ill. Rev. Stat. 1985, ch. 37, par. 704—8(2); *In re A.L.J.* (1985), 129 Ill. App. 3d 715, 716, 473 N.E.2d 132, 132-33; *In re G.L.* (1985), 133 Ill. App. 3d 1048, 1053, 479 N.E.2d 1234, 1238.) Though error, we believe the premature decree of wardship was harmless in the case at bar. (See *In re G.L.* (1985), 133 Ill. App. 3d 1048, 1053, 479 N.E.2d 1234.) At the instant dispositional hearing, the court had the benefit of a dispositional report and the parties' comments thereon, and the minor was given the opportunity to present matters

in mitigation. It was on this basis that the court, properly informed, placed the minor on probation. In any event, the serious offense which was the basis for the delinquency finding appeared to require a decree of wardship regardless of what additional evidence was adduced, and the minor does not argue otherwise now. Finally, if during the dispositional hearing the premature decree of wardship was shown to the trial court to be unwarranted, we know of no reason why the court could not withdraw it; previously the decree was interlocutory at most. *Cf. Schroeder v. Meier-Templeton Association* (1985), 130 Ill. App. 3d 554, 559, 474 N.E.2d 744, 749.

For the foregoing reasons, we affirm the orders of the circuit court of Randolph County decreeing the minor a ward of the court and placing the minor on probation.

Affirmed.

JONES, J., concurs.

JUSTICE HARRISON, dissenting:

As the majority recognizes, when a child under the age of 14 is called as a witness, the trial court must determine whether the child is competent to testify. One criterion which the court must consider in making its determination is whether the child is sufficiently mature to appreciate the moral duty to tell the truth and comprehend the meaning of the oath. (*People v. Sims* (1969), 113 Ill. App. 2d 58, 61, 251 N.E.2d 795, 797.) The inquiry conducted by the court here failed to establish that the five-year-old complaining witness, Annie Smith, satisfied this criterion. The inquiry proceeded as follows:

"The Court: *** You are Annie Smith, is that right?

A. Yeah.

The Court: Annie, you know when something is right and when something is wrong. Do you understand that?

A. (Head nod in the affirmative.)

The Court: Do you understand when you are telling the truth and when you are not telling the truth?

A. He did get up and beat me.

The Court: I am not asking you what he did, Annie. I just want to know if you know when somebody is telling a lie and when somebody is not telling a lie. Do you know what that means? Do you understand that?

A. What?

The Court: Do you understand that when somebody is telling

a lie and when somebody is telling the truth? Do you know what it means?

A. (No response.)

Mr. Stumpf: Your Honor, if I may, her mother uses the word story.

The Court: Is that what you use?

Mrs. Smith: Yes.

The Court: Do you ever tell stories to your mommy that are not true?

A. Well, get up and beat me.

The Court: Now wait a minute. I want to know if you know when somebody is telling a story that's true or not. A bad story or good story.

A. When he hit somebody.

The Court: Do you ever tell your mommy a fib?

A. Yeah.

The Court: Do you know what it means to tell a fib?

A. (Head nod in the affirmative.)

The Court: You know that's not telling the truth when you are telling a fib. Is that right?

A. (Head nod in the affirmative.)

The Court: Your mommy ever spank you for telling a fib?

A. Yes.

The Court: You know what it's like to tell a fib or not tell a fib. Is that right?

A. Yes.

The Court: If you are not telling the truth mommy might spank you. Is that right?

A. Yes.

The Court: You know what it means to tell the truth and not tell the truth?

A. Yeah.

The Court: Think anything else should be asked of her, gentlemen?

Mr. Brown: I'd request you ask her if she knows in her own words what is a lie or fib.

The Court: Do you know what a fib is? Can you tell me.

A. Yes. She spanks me.

The Court: She will spank you if you tell a fib?

A. Yes.

The Court: What fib did you ever tell your mommy? Can you think of something you told your mother that was a fib?

A. What?

The Court: Can you think of something that you told your mommy that was a fib?

A. Yeah.

The Court: What did you tell her?

A. She would say—

The Court: She tell you to put away your toys sometimes and you wouldn't do it? Did you ever do that?

A. Yeah.

The Court: Is that a fib when you told your mommy you would do it and you didn't do it?

A. Yeah.

The Court: You weren't telling her the truth when you told her you put away your toys and you hadn't. Is that right?

A. (No response.)

The Court: If you put your toys away then you would be telling the truth. Is that right?

A. Yes.

The Court: You know what it means if you tell her something that is not true?

A. (Head nod in the affirmative.)

The Court: I think she has an understanding what a fib is and what's not a fib.

Mrs. Smith: She knows what it is, but it's different this morning.

The Court: Difficult to tell us. I think she is qualified to tell us what she knows."

As this exchange shows, the witness was able to indicate comprehension of the difference between telling the truth and telling a "fib" only after prodding by the court through questions so leading that a five-year-old could scarcely be expected to answer other than in the affirmative. Although certain of her responses reflect an understanding that she would be spanked by her mother if she told a "fib," one cannot equate an awareness of the consequences of lying (as perceived by her mother, after the fact) with an ability to distinguish the truth from a falsehood, nor can one infer from a fear of corporal punishment an appreciation of the moral obligation to be truthful. Moreover, the notion that "fibbing" would result in a spanking was implanted in the witness solely through the suggestive questioning of the court. It was not raised by the witness herself. When asked a non-leading question, the witness was unable to explain in her own words what it meant to lie or why lying was wrong. Indeed, as the majority

acknowledges, she tended to be unresponsive or to give inappropriate responses when confronted with such questions. Even her answers to leading questions were sometimes inconclusive. For example, when the court asked, "Is that a fib when you told your mommy you would do it [put away your toys] and you didn't do it" the witness responded, "Yeah." But when it followed up with the question, "You weren't telling her the truth when you told her you put away your toys and you hadn't. Is that right?" The witness was able to give no answer.

The majority does not cite, and I have not found, anything in the subsequent testimony of the witness which would give any better indication that she had any understanding of the moral duty to tell the truth, or even the meaning of the truth itself. Under these circumstances, I cannot agree that no error was committed when the witness was permitted to testify. To find Annie Smith competent on the record here is to reduce the competency requirement to a meaningless formality, an exercise directed solely toward eliciting certain desired responses regardless of a witness' level of comprehension. A finding of delinquency must rest on more than that. I would reverse.